10-3381-cr
United States v. Banki

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2010

(Argued: February 15, 2011    Decided: October  24, 2011)

(Amended:  February 21, 2012 and February 22, 2012)

Docket No. 10-3381-cr

———————————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

MAHMOUD REZA BANKI,

*Defendant-Appellant.*

———————————————

Before:
        CABRANES, POOLER, and CHIN, *Circuit Judges*.

        Appeal from a judgment of the United States

District Court for the Southern District of New York (John

F. Keenan, *J.*) convicting defendant-appellant of violating

regulations relating to trade with Iran and making false

statements in response to Treasury Department subpoenas.

        AFFIRMED in part and VACATED and REMANDED in part.

            E. DANYA PERRY, Assistant United States
                Attorney (Katherine Polk Failla,
                Assistant United States Attorney, *on
                the brief*), *for* Preet Bharara,
                United States Attorney for the
                Southern District of New York, New
                York, New York, *for Appellee*.

CERTIFIED COPY ISSUED ON 02/22/2012

KATHLEEN M. SULLIVAN (Christine H. Chung,
        Marc L. Greenwald, William B. Adams,
        *on the brief*), Quinn Emanuel
        Urquhart & Sullivan, LLP, New York,
        New York; Baruch Weiss, Arnold &
        Porter LLP, Washington, D.C.; Tai H.
        Park, Park & Jensen LLP, New York,
        New York, *for Defendant-Appellant*.

Raymond A. Cardozo, Paige H. Forster,
        Donna M. Doblick, Reed Smith LLP,
        Pittsburgh, Pennsylvania, *for Amici
        Curiae Iranian American Bar
        Association et al.*

CHIN, *Circuit Judge*:

Defendant-appellant Mahmoud Reza Banki ("Banki")
appeals from a judgment of the United States District Court
for the Southern District of New York convicting him,
following a jury trial, of (1) conspiracy to violate the
Iranian Transactions Regulations (the "ITR") and operate an
unlicensed money-transmitting business; (2) violating the
ITR; (3) operating an unlicensed money-transmitting
business; and (4) two counts of making false statements in
response to government subpoenas.

On appeal, Banki argues that the district court
erred in several respects when instructing the jury on the
conspiracy, ITR, and money-transmitting counts.  He also
argues that he is entitled to a new trial on the false
statement counts because the government constructively
amended the indictment.  He further accuses the government
of misconduct in its rebuttal summation, which he claims

necessitates a new trial on all counts. Finally, he argues that he should be resentenced because the district court miscalculated the applicable offense level.

We AFFIRM in part and VACATE and REMAND in part.

## STATEMENT OF THE CASE

### 1. *The Facts*

Born in Tehran, Iran, Banki is a naturalized U.S. citizen who has lived in the United States since he was 18. After completing high school in Iran, Banki moved in 1994 to the United States to attend college. While Banki has lived in the United States, many of his family have continued to reside in Iran, including his father, mother, uncle, and cousin.

In Iran, Banki's family owned three power companies and a pharmaceutical company; his uncle was a director of all four companies, and his cousin was the CEO of one of the power companies.

Beginning in May 2006, Banki's family began to transfer large amounts of money -- totaling some $3.4 million -- from Iran to the United States. At trial, the defense argued these transfers were necessary to protect the family's assets. Banki's mother testified that the money was intended to be used to purchase an apartment in the United States for herself, Banki, and his brother.

The transfers were effectuated through an informal
system called a "hawala."  The hawala system is widely used
in Middle Eastern and South Asian countries, and is
primarily used to make international funds transfers.[1]
Though there are many forms of hawala, in the paradigmatic
hawala system, funds are transferred from one country to
another through a network of hawala brokers (i.e.,
"hawaladars"), with one hawaladar located in the
transferor's country and one in the transferee's country.
In this form, a hawala works as follows:  If Person A in
Country A wants to send $1,000 to Person B in Country B,
Person A contacts Hawaladar A in Country A and pays him
$1,000.  Hawaladar A then contacts Hawaladar B in Country B
and asks Hawaladar B to pay $1,000 in Country B currency,
minus any fees, to Person B.  The effect of this transaction
is that Person A has remitted $1,000 (minus any fees) to
Person B, although no money has actually crossed the border
between Country A and Country B.

Eventually, Hawaladar B may need to send money to
Country A on behalf of a customer in Country B; he will then
contact Hawaladar A, with whom he now has a credit due to
the previous transaction.  Hawaladar A will remit the money

---

[1]    Amici contend that where it is used, the hawala is a
"widely-accepted cultural norm."

- 4 -

in Country A to the designated person there, thus clearing the debt between the two hawaladars. Typically, Hawaladar A and Hawaladar B would engage in many parallel transactions moving in both directions. A number of transactions might be required before the books are balanced between the two hawaladars. If after some period of time their ledgers remain imbalanced, the hawaladars may "settle" via wire transfer or another, more formal method of money transmission. The hawala system operates in large part on trust, since, as in the example above, a hawaladar will remit money well before he receives full payment, and he does so without the benefit of a more formal legal structure to protect his investment.

To send money to Banki in the United States, Banki's family retained the services of Ali Bakhtiari, a Tehran-based hawaladar. In contrast to the paradigmatic, two-hawaladar system discussed above, Bakhtiari used a "matching" hawala system to facilitate the transfer of funds from Iran to the United States. Under the "matching" system, when Bakhtiari knew that Banki's family wanted to send a sum of money to the United States, he would search among his U.S.-based contacts for someone who wanted to send approximately the same amount to Iran. If he was unable to find a "match" among his U.S.-based contacts, which was often the case, he would reach out to his network of Iran-

- 5 -

based brokers to see if any of them knew of a match. These
brokers generally did not reveal the identity of their U.S.-
based contact, for fear of being cut out of the transaction
by Bakhtiari; instead, Bakhtiari would give the Iran-based
broker Banki's account information, which the broker would
relay to his U.S.-based contact. The U.S.-based contact
would then transfer into Banki's account a sum comparable to
the amount Banki's family wished to send. Once Bakhtiari
confirmed that the U.S.-based contact had transferred the
money into Banki's account, he would pay an equivalent
amount to the U.S.-based contact's intended recipient or to
the Iran-based broker who facilitated the match for the
broker to distribute to the intended recipient. Bakhtiari
and the broker would split the profits, which were derived
from the difference in the "buy" and "sell" exchange rates,
on any completed transaction.

Between May 2006 and September 2009, Banki
received as many as 56 hawala-related deposits in his Bank
of America account from at least 44 different individuals
and companies. Most of the deposits were made via wire
transfer, but some were made via ATM deposit, counter
credit, or check. Wires for the transfers included
references to one contract for pistachios and to another for
"tomato paste and transportation." The denominations of the
individual deposits ranged from $2,600 to $199,971. There

- 6 -

were nine deposits of $10,000 or less; forty-one deposits of between $10,000 and $100,000; and six deposits of more than $100,000.  In total, almost $3.4 million was deposited into Banki's account.  Banki retained this $3.4 million for his personal use, including the purchase of a $2.4 million apartment in New York City.

The majority of the depositors were individuals, but some were business entities, located all over the world, including Hillmarcs Construction Corp. in the Philippines, United Gulf Exchange Company in Kuwait, Torgovy Dom Atlanta in Russia, and the Trenton Group, LLC, in Latvia.  Banki did not personally know any of the depositors.

For most of these deposits, after the funds were deposited into Banki's account, Banki e-mailed a family member, almost always his father, to confirm that he had received the funds.  For example, on May 8, 2006, Banki received a wire transfer of $199,971 from United Gulf Exchange Co.'s account at a Kuwaiti bank; then, on May 10, 2006, Banki wrote an e-mail to his father stating, "Here is a list of what I have received so far in the account. . . . May 8, 2006:  199k from Kuwait . . . ."

Though most of Banki's e-mails did not explicitly acknowledge that there was a corresponding payout *in Iran* for each deposit into Banki's account, one August 2006 e-mail exchange clearly displayed Banki's knowledge that money

- 7 -

was moving to Iran, at least with respect to the August 2006 transaction. On August 9, 2006, Banki's uncle sent Banki an e-mail that stated: "I told your father that a friend of mine wants to send 6000 USDA to Iran. I asked him to send the money to that account you gave me before." Shortly thereafter, Ahmad Sheikholeslami transferred $6,000 into Banki's account, and Banki e-mailed his uncle to confirm receipt of the money. According to Sheikholeslami, a defense witness, Banki's uncle was doing him a personal favor by facilitating the transfer, and Bakhtiari was not involved in the $6,000 transaction. Sheikholeslami's claim that the $6,000 transaction was unrelated to Bakhtiari's hawala was confirmed by Bakhtiari's ledgers, which did not reflect the transaction. This transfer was undisputed by Banki.

The transfers into Banki's account came to the attention of the government, and in 2008, the U.S. Treasury Department Office of Foreign Asset Control ("OFAC") served Banki with two administrative subpoenas. Both subpoenas requested information about transfers into Banki's account and advised Banki that "knowingly falsifying or concealing a material fact in [his] response . . . is a felony." The January 2008 subpoena requested information about a $100,000 transfer into Banki's account in January 2007. By letter dated January 16, 2008, Banki responded, identifying his

- 8 -

cousin as the source of the transfer.  Then, in a June 2008 subpoena, OFAC requested "details of all payments [Banki had] made, received, or facilitated in any manner involving Iran since July 1, 2003."  In his response, Banki again identified his cousin as the source of the funds, and stated that Banki had "made no payments to anyone in Iran since [arriving] in the United States in 1994."

**2.    *Proceedings Below***

In January 2010, Banki was indicted and arrested in New York City.  In March 2010, the government filed a superseding indictment (the "Indictment"), charging Banki with five counts as follows:

> Count One:  Conspiring to (a) violate the ITR, 31 C.F.R. pt. 560, and (b) operate an unlicensed money-transmitting business, in violation of 18 U.S.C. § 1960;

> Count Two:  Violating, or aiding and abetting the violation of, the ITR;

> Count Three:  Conducting, or aiding and abetting the conduct of, an unlicensed money-transmitting business;

> Count Four:  Making materially false representations in response to a January 8, 2008 OFAC subpoena; and

> Count Five:  Making materially false representations in response to a June 24, 2008 OFAC subpoena.

At the conclusion of a 15-day jury trial in May 2010, the jury convicted Banki on all counts.  On Counts Two and Three, the jury found Banki guilty as an aider and abettor, not as a principal.

Raising largely the issues he raises on appeal, Banki moved for a new trial under Rule 33. In a written decision, the district court (John F. Keenan, *J.*) denied the motion. *United States v. Banki*, 733 F. Supp. 2d 404 (S.D.N.Y. 2010). In August 2010, the district court sentenced Banki to 30 months' imprisonment, below the Guidelines range of 63-78 months.

This appeal followed.

### DISCUSSION

## I. *Jury Instructions*

This Court reviews a claim of instructional error de novo and will set aside a conviction only where, "viewing the charge as a whole, there was prejudicial error." *United States v. Hassan*, 578 F.3d 108, 128 (2d Cir. 2008) (internal quotation marks omitted); *accord United States v. Amato*, 540 F.3d 153, 164 (2d Cir. 2008). Jury instructions must be viewed "in the context of the entire trial, not separately and in isolation." *United States v. Reese*, 33 F.3d 166, 172 (2d Cir. 1994).

While a defendant is entitled to any legally accurate jury instruction for which there is a foundation in the evidence, he does not have a right to dictate the precise language of the instruction. *United States v. Han*, 230 F.3d 560, 565 (2d Cir. 2000); *United States v. Russo*, 74 F.3d 1383, 1393 (2d Cir. 1996). "If the substance of a

- 10 -

defendant's request is given by the court in its own language, the defendant has no cause to complain." *Han*, 230 F.3d at 565 (internal quotation marks omitted).

### A. *ITR Instructions (Counts One and Two)*

The International Emergency Economic Powers Act ("IEEPA") grants the President broad authority to issue regulations that restrict or prohibit international trade where he declares a "national emergency" with respect to an "unusual and extraordinary" foreign policy or national security threat. 50 U.S.C. §§ 1701–1702.

Though the President has exercised his authority under IEEPA to restrict trade with Iran since 1979, the trade restrictions at issue here date to 1995. That year, President Clinton issued Executive Order 12,957, which found that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declared "a national emergency to deal with that threat." Exec. Order No. 12,957, 60 Fed. Reg. 14,615, 14,615 (Mar. 15, 1995). A subsequent 1995 executive order, Executive Order 12,959, imposed comprehensive trade and financial sanctions on Iran; it prohibited, *inter alia*, "the exportation from the United States to Iran, the Government of Iran, or to any entity owned or controlled by the Government of Iran, or the financing of such exportation, of

- 11 -

any goods, technology, . . . or services." Exec. Order No.
12,959, 60 Fed. Reg. 24,757, 24,757 (May 6, 1995).

Pursuant to Executive Orders 12,957 and 12,959, the
Secretary of the Treasury promulgated the ITR, 31 C.F.R. pt.
560. Like Executive Order 12,959, the ITR generally
prohibit the exportation of goods, technology, or services
to Iran:

> **§ 560.204  Prohibited exportation,
> reexportation, sale or supply of goods,
> technology, or services to Iran.**
>
> Except as otherwise authorized pursuant
> to this part, . . . the exportation,
> reexportation, sale, or supply, directly
> or indirectly, from the United States, or
> by a United States person, wherever
> located, of any goods, technology, or
> services to Iran or the Government of
> Iran is prohibited . . . .

31 C.F.R. § 560.204. Thus, unless "otherwise authorized" in
part 560 of title 31 of the Code of Federal Regulations, a
United States person[2] or person located in the United States
may not export a service to Iran. Those who "willfully"
violate the ITR are subject to criminal penalties. 50
U.S.C. § 1705(a), (c).

Banki raises two challenges to the district
court's ITR instructions. First, he argues that the

---

[2]    Under the ITR, "'*United States person*' means any United
States citizen, permanent resident alien, entity organized under
the laws of the United States (including foreign branches), or
any person in the United States." 31 C.F.R. § 560.314 (emphasis
added).

district court erred by failing to instruct the jury that
executing money transfers to Iran on behalf of others
qualified as "services" under the ITR only if undertaken *for
a fee*.  Second, he argues that the district court erred by
failing to instruct the jury that non-commercial remittances
to Iran, including family remittances, are exempt from the
ITR's service-export ban.

### 1. *The Requirement of a Fee*

In *United States v. Homa International Trading
Corp.*, this Court held that "the execution on behalf of
others of money transfers from the United States to Iran is
a 'service'" under the ITR.  387 F.3d 144, 146 (2d Cir.
2004) (per curiam).  In so holding, the Court observed, "The
term 'services' is unambiguous and refers to the performance
of something useful *for a fee*."  *Id.* at 146 (emphasis added)
(citing *United States v. All Funds on Deposit in United Bank
of Switzerland*, No. 01 Civ. 2091(JSR), 2003 WL 56999, at *1
(S.D.N.Y. Jan. 7, 2003)).  Banki relies on this language,
arguing that executing money transfers to Iran on behalf of
others does not violate the ITR unless performed for a fee
and that, accordingly, the district court erred by failing
to so instruct the jury.[3]

---

[3]     Banki requested the following instruction:

The export of money from the U.S., if done
without a fee, does not constitute a

- 13 -

As a close reading of *Homa* reveals, however, the language in *Homa* suggesting that the receipt of a fee is a necessary element of a "service" is dicta.  The defendant in *Homa*, in challenging the sufficiency of the evidence, did not argue that the receipt of a fee was required to be convicted of exporting a service to Iran in violation of the ITR.  Rather, he argued: "It is simply unnatural to think of a transfer of funds as an 'exportation of services.'  If anything is being exported, it is the funds themselves." Brief of Defendant-Appellant at 43-44, *Homa*, 387 F.3d 144. Thus, the Court was called upon to decide whether exporting funds on behalf of another constituted the exportation of a "service," not whether a "service" required receipt of a fee.  Accordingly, the statement in *Homa* that "[t]he term 'services' is unambiguous and refers to the performance of something useful for a fee" is dicta, and we are not bound by it.

---

"service" under . . . the regulations.  The relevant provisions of the regulation address only *services*, and does [sic] not prohibit the movement of *funds*.

A "service" is the performance of something useful for a fee.  Thus, even if you find that Mr. Banki operated or facilitated the operation of a "hawala," you must still find that, in addition, that [sic] he did so for a "fee."  The movement of money constitutes a "service" only if it is done for a fee.  If you find that Mr. Banki did not receive a fee, or that he did not facilitate the receipt of a fee, you must find Mr. Banki not guilty.

Our conclusion that the language on which Banki relies is dicta does not, however, end our inquiry. It merely clears the path for our analysis of whether the receipt of a fee is a necessary element of a service.

"In interpreting an administrative regulation, as in interpreting a statute, we must begin by examining the language of the provision at issue." *Resnik v. Swartz*, 303 F.3d 147, 151-52 (2d Cir. 2002); *see United States v. Gagliardi*, 506 F.3d 140, 145 (2d Cir. 2007). The ITR do not define "services." *See* 31 C.F.R. § 560.204; *see also id.* §§ 560.301-.321 ("General Definitions"). Thus, we must "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in [this] case." *Gagliardi*, 506 F.3d at 145.

For its definition of service, the *Homa* Court cited *United States v. All Funds on Deposit in United Bank of Swizerland*, which in turn quoted *Black's Law Dictionary*. *See Homa*, 387 F.3d at 146; *All Funds*, 2003 WL 56999, at *1 (noting that *Black's* defines "'service' as 'the act of doing something useful for a person or company for a fee'" (quoting Black's Law Dictionary 1372 (7th ed. 1999))). Although *Black's* defines "service" as having a fee component, other dictionaries do not. *See, e.g.*, Merriam-Webster's Collegiate Dictionary 1067 (10th ed. 2000) (defining service as "useful labor that does not produce a

- 15 -

tangible commodity"); Webster's Third New International
Dictionary 2075 (Unabridged ed. 1993) (defining "service" as
"the performance of work commanded *or* paid for by another"
(emphasis added)). In fact, the very edition of *Black's*
cited in *All Funds* contains another definition of "service"
that does not have a fee component. Black's Law Dictionary
1372 (7th ed. 1999) (defining service as "[a]n intangible
commodity in the form of human effort, such as labor, skill,
or advice"). We therefore look to the broader text and
purpose of the ITR to aid our interpretation. *See United
States v. Pesaturo*, 476 F.3d 60, 68 (1st Cir. 2007)
(adopting an interpretation of a regulation because it was
"more persuasive both textually and in the context of the
government's stated purpose"). We have no difficulty
concluding that the transfer of funds on behalf of another
constitutes a "service" even if not performed for a fee.

The Iranian embargo is intended "to deal with the
unusual and extraordinary threat to the national security,
foreign policy, and economy of the United States" posed by
"the actions and policies of the Government of Iran." Exec.
Order No. 12,959, 60 Fed. Reg. 24,757, 24,757 (May 6, 1995);
Exec. Order No. 12,957, 60 Fed. Reg. 14,615, 14,615 (Mar.
15, 1995). The embargo is primarily concerned with a few
key actions and policies at the heart of the threat posed by
the Iranian government -- namely, the proliferation of

- 16 -

weapons of mass destruction, state-sponsored terrorist activity, and efforts to frustrate Middle East diplomacy. *See Homa*, 387 F.3d at 146.

By design, however, the embargo is deliberately overinclusive. Thus, for example, the ITR prohibit the exportation of not only advice on developing Iranian chemical weapons but also advice on developing Iranian petroleum resources, *see* § 560.209; not only services to the Iranian government but also services to Iranian businesses, *see* § 560.204; and not only bombs but also beer, *see* § 560.204. In other words, to reform the actions of the government of Iran, Executive Order 12,959 and the ITR adopt a blunt instrument: broad economic sanctions intended to isolate Iran. *See Homa*, 387 F.3d at 146 ("'[T]he obvious purpose of [Executive Order 12,959] is to isolate Iran from trade with the United States.'" (quoting *United States v. Ehsan*, 163 F.3d 855, 859 (4th Cir. 1998))).

Given that isolation of Iran is the tool that the embargo employs, there is no sound reason for the ITR to distinguish between (1) the exportation of a service to Iran for which the U.S. service provider *received a fee* and (2) the exportation of a service to Iran for which the U.S. service provider *did not receive a fee*, prohibiting only the former. After all, both exportations have the same impact *in Iran*.

– 17 –

Banki's argument that the term "services" has an inherent fee requirement also proves too much, for it would permit anomalies, such as permitting a U.S. entity to render uncompensated legal or consulting services to an Iranian corporation. We see no principled reason why the ITR would permit the exportation of consulting services to an Iranian corporation *gratis* but prohibit the exportation of the same consulting services for a fee.

Indeed, even without such broad economic sanctions intended to isolate Iran, Banki's argument that a fee is required fails because it would exempt from the ITR's service-export ban certain particularly high-risk transfers. Specifically, a fee requirement would provide a dangerous and unintended loophole for persons in the United States who are motivated to export services to Iran without regard to monetary compensation, including those seeking to foster the very actions and policies that prompted the establishment of the Iran embargo.

Thus, we conclude that the execution of money transfers from the United States to Iran on behalf of another, whether or not performed for a fee, constitutes the exportation of a service.

### 2. Non-Commercial Remittance Exception

Banki also argues that the district court erred by failing to instruct the jury that non-commercial remittances

to Iran, including family remittances, are exempt from the
ITR's service-export ban.[4]  He seeks a judgment of acquittal
or, alternatively, a new trial on Count Two and a new trial
on Count One.

As discussed above, the ITR generally prohibit the
exportation of "services" to Iran.  *See* 31 C.F.R. § 560.204.
In arguing that the ITR exempt non-commercial remittances
from the ITR's service-export ban, Banki relies on §
560.516, which reads as follows:

> **§ 560.516  Payment and United States dollar clearing transactions involving Iran.**
>
> (a) United States depository institutions are authorized to process transfers of funds to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, if the transfer is covered in full by any of the following conditions and does not involve

---

[4]     In the district court, Banki requested the following
instruction:

> Not all services and transactions are prohibited by the regulations.  All non-commercial transfers of funds, also called "remittances," are exempt.  For example, non-commercial transfers of funds between family members in Iran and family members located elsewhere for personal use, called "family remittances," are permitted under the regulations. . . .  Thus, any family transfers Mr. Banki participated in, whether to or from Iran, were permitted unless the government proves that the transfers were commercial in nature.  If the transfers were non-commercial, then they were permitted and that is true even if there was a fee involved.

debiting or crediting an Iranian account:

. . . .

> (2) The transfer arises from an
> underlying *transaction that is not
> prohibited by this part, such as a
> non-commercial remittance to or from
> Iran (e.g., a family remittance not
> related to a family-owned
> enterprise)* . . . .

31 C.F.R. § 560.516 (emphasis added).[5]

The parties disagree as to the meaning of the regulation. Banki argues that, by its plain language, § 560.516(a)(2) permits a "non-commercial remittance to or from Iran," including "a family remittance." The government argues, on the other hand, that § 560.516 permits non-commercial remittances between the United States and Iran *only* if such remittances are processed through a U.S. depository institution.

We hold that, at a minimum, the regulation is ambiguous in this respect. Consequently, we are required to interpret the regulation in Banki's favor, for "[t]he rule of lenity requires ambiguous criminal laws to be interpreted

---

[5]     The ITR define a "United States depository institution" as "any entity (including its foreign branches) organized under the laws of any jurisdiction within the United States, or any agency, office or branch located in the United States of a foreign entity, that is engaged primarily in the business of banking (for example, banks, savings banks, savings associations, credit unions, trust companies and United States bank holding companies)." 31 C.F.R. § 560.319. It is undisputed that neither Banki nor Bakhtiari's hawala is a United States depository institution.

in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008). The rule "vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain." *Id.* Here, the meaning of the regulation is uncertain.

First, the plain wording of § 560.516 supports Banki's view that family remittances are not prohibited -- at least not by 31 C.F.R. pt. 560. Indeed, the statute explicitly lists a "family remittance" as an example of a transaction that "is not prohibited" by Part 560. The relevant language, which appears as an enumerated condition under § 560.516(a), provides that U.S. depository institutions are authorized to process a transfer of funds to or from Iran when "[t]he transfer arises from an underlying transaction that is *not prohibited by this part*, such as a non-commercial remittance to or from Iran (e.g., *a family remittance* not related to a family-owned enterprise)." § 560.516(a)(2) (emphasis added). On its face, then, the regulation would seem to be clear: a "family remittance" is "not prohibited" by Part 560.

The conclusion that family remittances are *not prohibited* under Part 560 does not necessarily lead to the conclusion that they are *permitted* under the complete regulatory scheme. *See* 31 C.F.R. § 560.101 (requiring that

transactions comply with all other applicable laws and regulations). Nevertheless, the fact that § 560.516(a)(2) specifically lists family remittances as an example of the type of transactions U.S. depository institutions are authorized to process suggests that such actions do not contravene other applicable laws or regulations.

Second, the government's contention that *only* U.S. depository institutions "are authorized" to process the permitted transfers is inconsistent -- at least arguably -- with the language of the regulation.[6] A fair reading of § 560.516 is that it tells U.S. depository institutions (and securities brokers and dealers) that they are permitted to process non-commercial remittances, including family remittances, but the regulation does not provide that *only* U.S. depository institutions (and securities brokers and dealers) may do so. Indeed, nothing in section 560.516 specifically prohibits anyone from making a family remittance. The government's assertion that the regulation provides that family remittances "*must* be transacted through U.S. banks," Gov't's Br. at 22 (emphasis added), is not supported by the language of the regulation. If the intent were to permit *only* U.S. banks (and U.S. brokers and

---

[6] The regulation also expressly authorizes U.S. registered securities brokers or dealers to process the permitted transactions. 31 C.F.R. § 560.516(b).

dealers) to process these remittances, the regulation could have easily so provided.

We acknowledge that textual arguments can be made both ways. By authorizing U.S. banks and securities brokers and dealers to process these transactions, without authorizing anyone else, the regulation arguably limits the authorization to the specified entities. Moreover, under Banki's view, because non-commercial remittances are not prohibited, *arguably anyone* could process a non-commercial remittance for another. If that were the case, there would be no apparent need to authorize a U.S. depository institution to do so, and the first clause of § 560.516(a) would be rendered a nullity, in violation of the well-settled principle of statutory construction requiring courts to "give effect to every clause and word of a statute, if possible." *R.E. Dietz Corp. v. United States*, 939 F.2d 1, 5 (2d Cir. 1991); *accord Corley v. United States*, 129 S. Ct. 1558, 1566 (2009) ("A statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal quotation marks and brackets omitted)).

We are not persuaded by the government that § 560.516 unambiguously grants U.S. depository institutions exclusive authority to process non-commercial remittances between the United States and Iran. First, it is not at all

clear that Banki's interpretation of the regulation would
render the first clause a nullity.  Given the complexity of
the regulatory scheme, the number of prohibitions and
exemptions contained in the ITR, the highly-regulated nature
of the banking industry, and the criminal nature of the
violations, it is appropriate that financial institutions
are given explicit guidance that they may process these
specific transactions.  The processing of money transfers is
undoubtedly a "service," and the language in the regulation
makes clear that U.S. banks can process non-commercial
remittances without running afoul of the ban on providing
services.  Without the language authorizing banks to provide
this service, banks would not be able to process non-
commercial remittances, even if they are not prohibited.  We
do not agree with the assertion that under Banki's
interpretation *anyone* could process a non-commercial
transaction; under the more general ban on providing goods,
technology, and services, providing a "service" of
processing non-commercial remittances would be barred.
Hence, the language in the first clause is necessary to
permit U.S. banks to provide this service.

        Second, the same principle of statutory
construction can be applied to the government's
interpretation of the regulation:  If the first clause means
that *only* U.S. banks (and U.S. securities brokers and

dealers) are authorized by the first clause to process non-commercial remittances, arguably the language providing that such transactions are "not prohibited" likewise would be superfluous. The two clauses can both have meaning: non-commercial remittances are not prohibited, and U.S. banks are authorized to provide the service of processing them.

Moreover, no provision in the ITR prohibits a United States person from remitting his own funds to an individual in Iran for a non-commercial purpose. *See* 31 C.F.R. §§ 560.201-.209 ("Prohibitions"); *see also* 31 C.F.R. § 560.204 (prohibiting exportation of "goods, technology, or services" to Iran, but not prohibiting exportation of funds). While there are provisions prohibiting the remitting of funds for certain purposes,[7] there is no general bar to the remissions of funds, *see* 31 C.F.R. pt. 560, and § 560.516(a)(2) expressly provides that non-commercial remissions are not prohibited. In contrast, the sanctions enacted during the 1979 Iranian hostage crisis

---

[7]     Nonetheless, the remitting of funds -- including one's own funds -- to Iran is prohibited if the funds are being sent for certain purposes. For example, a United States person is prohibited from remitting his funds to Iran to invest "in Iran" or "in property owned or controlled by the Government of Iran." 31 C.F.R. § 560.207. Nor may a United States person remit his funds to Iran to purchase Iranian petroleum resources, *see* 31 C.F.R. § 560.209(a)(1), or to finance the development of Iranian petroleum resources, *see* 31 C.F.R. § 560.209(b)(1). Similarly, a United States person may not remit his funds to Iran to purchase "[g]oods or services of Iranian origin or owned or controlled by the Government of Iran." 31 C.F.R. § 560.206(a)(1).

specifically prohibited the "transfer of funds" to Iran, and even then "family remittances" were excepted.  Exec. Order No. 12,211, 45 Fed. Reg. 26,685 (Apr. 17, 1980), *revoked by* Exec. Order No. 12,282, 46 Fed. Reg. 7925 (Jan. 19, 1981); Exec. Order No. 12,205, 45 Fed. Reg. 24,099 (Apr. 7, 1980), *revoked by* Exec. Order No. 12,282.  A fair question thus exists as to whether a person could -- without violating the ITR -- transmit funds herself to Iran, for example, by personally carrying cash on a plane to Iran, assuming compliance with any applicable customs laws.

The government also argues that its interpretation would further the purposes of the ITR.  The ITR impose recordkeeping and reporting requirements on U.S. depository institutions when processing ITR-related transactions.  *See, e.g.*, 31 C.F.R. § 560.516(c) (requiring U.S. depository institutions to verify "that [an] underlying transaction is not prohibited" by the ITR before initiating payment on behalf of a customer); *see also* 31 C.F.R. § 501.601 (requiring retention of transaction records for five years), § 501.602 (requiring reports to be submitted "under oath").  Construing the regulation to provide that only U.S. banks (and securities brokers and dealers) are authorized to process non-commercial remittances would further the ITR's "evident purpose" of subjecting transactions to and from Iran to "U.S. oversight and regulation."  *All Funds*, 2003 WL

56999, at *2.  The government fairly argues that it seems
unlikely that the ITR would impose such strict compliance
procedures on U.S. depository institutions processing non-
commercial remittances, but impose no such requirements on
hawalas transmitting non-commercial remittances.

At the same time, the ITR were adopted to address
the actions of the Iranian government while limiting the
adverse impact of the sanctions on the Iranian people.  *See*
31 C.F.R. § 560.210 (exempting from regulation certain
personal communications, humanitarian donations, information
and information materials, and travel); Exec. Order No.
12,957, 60 Fed. Reg. 14,615, 14,615 (Mar. 15, 1995) (finding
"that the actions and policies of the *Government of Iran*
constitute an unusual and extraordinary threat" (emphasis
added)).[8]

In light of the ambiguity in the regulation,
Banki's conviction on Counts One and Two must be vacated and
remanded for a new trial.

---

[8]    Banki and amici contend that U.S. depository
institutions are unwilling to process family remittances to Iran,
and that individuals with family in Iran have no choice but to
resort to hawalas to provide their families with support.  While
we take note of this contention, we do not rely on it in deciding
this appeal.

**B.** *Money Transmitting Instructions (Counts One and Three)*

Count Three charged Banki with conducting, or aiding and abetting the conduct of, an unlicensed money-transmitting business, in violation of 18 U.S.C. § 1960.

Under § 1960, "[w]hoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business" is subject to criminal penalties. 18 U.S.C. § 1960(a). As used in § 1960:

> the term 'unlicensed money transmitting business' means a money transmitting business which . . . --
>
> > (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, . . . ;
> >
> > (B) fails to comply with the money transmitting business registration requirements under [31 U.S.C. § 5330, which require money-transmitting businesses to register with the Secretary of the Treasury] . . . ; or
> >
> > (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity . . . .

*Id.*; *see* 31 U.S.C. § 5330(a)(1) ("Any person who owns or controls a money transmitting business shall register the

- 28 -

business (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury . . . ."). New York, where Banki lived during the relevant time period, prohibits "engag[ing] in the business of" transmitting money without a license, and violators can be convicted of a misdemeanor or felony, depending on the amount transmitted. N.Y. Banking Law §§ 641, 650 (McKinney 2011). It is undisputed that Banki neither possessed a New York money-transmitting license nor registered with the Secretary of the Treasury.

Section 1960 defines "money transmitting" broadly: "'money transmitting' includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." *Id.* § 1960(b)(2). The parties do not dispute that transferring funds through a hawala qualifies as "money transmitting" under § 1960.

Relying on this Court's definition of "money transmitting business" in *United States v. Velastegui*, Banki argues that the district court, in instructing the jury, erred by failing to define "money transmitting business" as (1) an enterprise (not a single transaction) (2) that is conducted for a fee or profit. *See United States v. Velastegui*, 199 F.3d 590, 592, 595 n.4 (2d Cir. 1999)

– 29 –

(defining a "money transmitting business" as the transmission of money "for a fee" involving more than "a single, isolated transmission of money").  Banki requested such an instruction below,[9] but the district court declined to give it, instructing the jury instead as follows:

> The term "money transmitting business" includes any business which provides check cashing, currency exchange or money transmitting or remittance services or issues or redeems money orders, travelers checks and other similar instruments or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system.  It is for you to determine whether the quantity and nature of the transmittals constitute a business. However, I instruct you that a hawala is a money transmitting business.

---

[9]   Banki requested the following instruction:

A "business" is a commercial enterprise that is regularly carried on for profit.  Thus, a single isolated transmitting of money is not a business under this definition.  It is for you to determine when the quantity and nature of the transmittals convert transactions into a business.

.  .  .  .

To be a "money transmitting business," the business must transmit money to a recipient in a place that the customer designates, for a fee paid by the customer.

–  30  –

The district court, in denying Banki's Rule 33 motion, explained that it declined to define "business" because the term is self-explanatory: "A business is not a complex or legal concept. No juror needs a judge's charge of law to comprehend that a 'business' is an ongoing enterprise carried out for financial gain; there is no other interpretation of the term 'business' the jury could have possibly applied." *Banki*, 733 F. Supp. 2d at 417; *cf. Vargas v. Keane*, 86 F.3d 1273, 1283 (2d Cir. 1996) (Weinstein, *J.*, concurring) ("The phrase 'reasonable doubt' is self-explanatory and is its own best definition." (internal quotation marks and citation omitted)).

While we largely agree with the district court that the term "business" is self-explanatory, we conclude that the district court erred in its charge here.

First, Banki's requested charge was "legally correct." *Han*, 230 F.3d at 565.[10] In *United States v. Velastegui*, we held that "an agent could [not] face federal criminal prosecution [under § 1960] . . . for an isolated instance of improper transmittal of money" because "section 1960(a) requires that the unlicensed entity be 'an illegal money transmitting *business*.'" 199 F.3d at 595 n.4. Thus,

---

[10] The government does not dispute that Banki's requested instruction is accurate; instead, it argues that "the definition of 'business' [is] self-explanatory and necessarily presumed multiple, fee-based transfers."

- 31 -

to find a defendant liable for operating an unlicensed money transmitting business, a jury must find that he participated in more than a "single, isolated transmission of money." *See id.* Likewise, giving the term "business" its "plain and unambiguous" meaning, *see United States v. Fuller*, 627 F.3d 499, 504 (2d Cir. 2010), under § 1960 a "business" is an enterprise that is carried on for profit or financial gain. *See* Merriam-Webster's Collegiate Dictionary 1067 (10th ed. 2000) (defining "business" as "a *commercial* or sometimes an industrial enterprise"); Webster's II New Riverside University Dictionary (1994) (defining "business" as a "*commercial* enterprise or establishment"). *See Velastegui*, 199 F.3d at 592 ("A money transmitting business receives money from a customer and then, *for a fee paid by the customer*, transmits that money to a recipient . . . ." (emphasis added)).

Second, there was a "foundation in the [trial] evidence," *United States v. Russo*, 74 F.3d 1383, 1393 (2d Cir. 1996), for Banki's request for an instruction that a "business" must involve more than a single, isolated transaction. The evidence at trial was such that a rational jury could have concluded that the government proved beyond a reasonable doubt that Banki knew funds were moving to Iran in only *one* transaction: the $6,000 Sheikholeslami transaction. Although the e-mails associated with the

$6,000 transaction clearly showed that Banki knew that funds were moving to Iran as part of the transaction, e-mails relating to other hawala transactions were far less explicit.  In addition, Bakhtiari's testimony and ledgers supported the inference that Bakhtiari was not involved in the $6,000 transaction; thus, the jury could have concluded, as the defense argued, that the $6,000 transaction was a one-time favor for a family friend.  The jury could have concluded that the government failed to prove that Banki knew funds were moving to Iran in more than one transaction, and, accordingly, Banki was entitled to the substance of his requested instruction -- that he could not be convicted under § 1960 for a single, isolated transmission of money.

Third, the district court compounded the problem by stating, in its charge to the jury:  "I instruct you that a hawala is a money transmitting business."  By doing so, the district court arguably relieved the government of its burden of proving that Banki's knowledge that money was moving to Iran extended beyond the $6,000 transaction.  *See* 18 U.S.C. § 1960 (prohibiting "knowingly" conducting an unlicensed money transmitting business); *Velastegui*, 199 F.3d at 592, 595 n.4 (holding that a "money transmitting business" must involve more than "a single, isolated transmission of money").  In its background instructions, the district court had charged the jury, "In this case you

have heard allegations that the defendant operated a hawala, an unlicensed value transfer *system*, through which money was sent to Iran." (Tr. at 1629:13-15 (emphasis added)). By later instructing the jury that "a hawala is a money transmitting business," the district court arguably was instructing the jury that if it found that Banki operated a "hawala," then he necessarily operated a money transmitting business, thereby taking the latter issue away from the jury. Simply put, looking at the charge in the context of the entire trial, we are uncertain of the theory on which the jury chose to convict.

Accordingly, we vacate Banki's convictions on Count One (to the extent it alleged that Banki operated an unlicensed money-transmitting business in violation of 18 U.S.C. § 1660) and Count Three and remand for a new trial.

**C.** ***Customer or Beneficiary Instruction (Counts One, Two, and Three)***

Banki next argues that the district court erred by refusing to instruct the jury that a "mere customer or beneficiary" of a hawala transaction cannot be held

criminally liable, either as an aider and abettor on Counts
Two and Three, or as a conspirator on Count One.[11]

With respect to the money-transmitting count,
Banki argues that the district court erred by refusing to
instruct the jury that a "mere customer or beneficiary" of
an unlicensed money-transmitting business is exempt from
criminal liability.  In so arguing, Banki draws an analogy
between his case and this Court's case law excepting certain
minor participants in (1) illegal gambling businesses and
(2) drug transactions from criminal liability.  Banki's
reliance on these cases is misplaced.

First, as to the gambling analogy, Count Three
charges Banki with violating 18 U.S.C. § 1960, which imposes

_____

[11]    Banki's proposed instruction on the ITR and money-
transmitting counts stated the following:

>     [I]f Mr. Banki acted as a mere customer or
>     beneficiary of the hawala or unlicensed
>     transmittal service, then the government has
>     not met its burden and you may not find Mr.
>     Banki liable as an aider and abettor.  That
>     is true even if, while utilizing or
>     benefitting from the services of the hawala
>     or unlicensed transmittal service, he had a
>     full understanding of the hawala or
>     transmittal services. . . .  A customer who
>     calls Iran with the purpose of effectuating
>     transfers for others may be acting beyond his
>     capacity as a mere customer.  On the other
>     hand, if a customer is calling simply to
>     acknowledge his or her own receipt of funds
>     and is acting normally incident to being a
>     customer or beneficiary, then such an act,
>     without more, cannot form the basis of
>     liability.

Banki proposed a similar instruction for the conspiracy count.

- 35 -

criminal penalties on a person who "knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business." 18 U.S.C. § 1960(a). Similarly, 18 U.S.C. § 1955 -- which was the model for § 1960, *see* S. Rep. No. 101-460, at 15 (1990) -- imposes criminal sanctions on any person who "conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business." 18 U.S.C. § 1955(a).

We have interpreted 18 U.S.C. § 1955 to prohibit a broad range of conduct: the statute reaches "not only the upper, but also the lower, echelon of a gambling business," including agents, runners, independent contractors, and salesmen. *United States v. Grezo*, 566 F.2d 854, 857 (2d Cir. 1977); *United States v. Becker*, 461 F.2d 230, 232 (2d Cir. 1972), *vacated on other grounds*, 417 U.S. 903 (1974). Mere betting customers, however, do not "conduct" the gambling business within the meaning of § 1955. *Grezo*, 566 F.2d at 857.

But not all bettors are isolated from criminal liability under § 1955. In *Grezo*, the defendant, who was an independent bookmaker who placed "layoff bets" with a larger gambling business that was the target of the indictment, was accused of "conducting" the target gambling business. *Id.* at 857-58. Rejecting the defendant's argument that he was a "mere bettor or customer," we held that "when otherwise

- 36 -

independent bookmakers [whose gambling businesses do not meet the definition of 'business' under § 1955] regularly place consistent, substantial layoff bets with a gambling business [as defined by § 1955], they should be considered to 'conduct' that business within the meaning of § 1955, despite any superficial similarity which their activities may bear to those of the average customer." *Id.* at 859. In so holding, we reasoned that because a layoff bettor's bets help a bookmaker balance his own book of bets and maintain a uniform "line" among bookmakers, the bookmaker and defendant layoff bettor shared a "community of interest," which separated the layoff bettor from a "mere" bettor. *Id.* at 859.

Second, Banki draws an analogy to *Abuelhawa v. United States*, 129 S. Ct. 2102 (2009). In *Abuelhawa*, the defendant placed six phone calls to arrange two one-gram cocaine purchases -- transactions that amount to misdemeanors under the Controlled Substances Act, 21 U.S.C. § 844. 129 S. Ct. at 2104. Instead of charging Abuelhawa with misdemeanors, however, the government charged Abuelhawa with, and obtained convictions on, six felony counts of using a communication facility to "facilitate" drug distribution, 21 U.S.C. § 843(b). 129 S. Ct. at 2104. The Supreme Court reversed Abuelhawa's convictions, reasoning that "where a statute treats one side of a bilateral

- 37 -

transaction more leniently, adding to the penalty of the party on that side for facilitating the action by the other would upend the calibration of punishment set by the legislature." *Id.* at 2106.

Even assuming, however, that a "mere customer or beneficiary" exemption, as requested by Banki, applies in the context of § 1960, we would conclude that Banki was not entitled to such an instruction.

"A defendant is entitled to a jury instruction on a defense theory *for which there is any foundation in the evidence*." *United States v. Russo*, 74 F.3d 1383, 1393 (2d Cir. 1996) (emphasis added) (internal quotation marks omitted). Here, there was no foundation in the evidence for a mere customer or beneficiary instruction.

Banki was convicted of facilitating the transfer of money *to* Iran, not with receiving money *from* Iran. The Indictment alleged in Count Three that Banki "effectuated, and aided and abetted, the transfer of [funds] . . . *to* residents within Iran." (Indictment ¶ 22 (emphasis added)). In addition, the district court repeatedly instructed the jury that it was Banki's role in the transfer of funds to Iran, not his receipt of funds from Iran, that potentially subjected him to criminal liability. (*See* Tr. 1629:13–23 ("In this case you have heard allegations that the defendant operated a hawala, an unlicensed value transfer system,

through which money was sent to Iran. . . . I remind you
that the defendant is charged with sending money to Iran,
not with receiving money from Iran."); *see* Tr. 17:9-11
("[Banki] is not charged with transmitting money or services
to the Iranian government; he is charged with sending money
to people in Iran.")).  Thus, the jury could only convict
Banki for money-transmitting for his role in transferring
funds *to Iran*.

With respect to the transfer of funds *to Iran*,
Banki's role was that of an intermediary -- not a customer
or beneficiary.  By finding Banki guilty on the money-
transmitting count, the jury necessarily found that Banki
knew that he was facilitating the transfer of funds to Iran.
*See* 18 U.S.C. § 1960(a).  The defense argues that if Banki
had the requisite knowledge with respect to any transaction,
it was only the $6,000 transaction.  But even with respect
to that transaction, Banki was *an intermediary* -- not a
customer or beneficiary.  Simply put, where the crime
charged is transmitting money to Iran without a license, the
"customer" is the wire originator and/or the intended
recipient.

Nor was Banki entitled to a mere customer or
beneficiary instruction on the ITR count.  The ITR count
charged Banki with violating the ITR by providing "money
transfer services, through the operation of a 'hawala'

- 39 -

informal value transfer system, *to persons in Iran*."
(Indictment ¶ 20 (emphasis added)).  In other words, Banki
was accused of being the *supplier* of the unlawful service --
not a customer or beneficiary.  Thus, to give a "mere
customer or beneficiary" instruction on the ITR count at
Banki's trial would be the equivalent of giving such an
instruction at the trial of Abuelhawa's drug dealer.
Accordingly, there was no foundation in the evidence for
Banki's requested instruction.  *See Russo*, 74 F.3d at 1393.

Finally, Banki was not entitled to a "mere
customer or beneficiary" instruction on the conspiracy
count.  In support of such an instruction, Banki relies on
the "buyer-seller exception" in this Court's conspiracy case
law.  "To prove a conspiracy, the evidence must show that
'two or more persons agreed to participate in a joint
venture intended to commit an unlawful act.'"  *United States
v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009) (quoting *United
States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997)).
Although, "[a]s a literal matter, when a buyer purchases
illegal drugs from a seller, two persons have agreed to a
concerted effort to achieve the unlawful transfer of the
drugs from the seller to the buyer," we have "carved out a
narrow exception to the general conspiracy rule for such
transactions."  *Id.* at 234.  This exception is intended to
"preserve[] important priorities and distinctions of the

federal narcotics laws, which would otherwise be
obliterated." *Id.* It is the buyer -- the less culpable
party -- who may take advantage of the buyer-seller
exception. *Id.*

Given that Banki was accused of conspiring to
export a service *to Iran* and operate an unlicensed money-
transmitting business that remitted funds *to Iran*, there is
no basis in the evidence to conclude that Banki was the
equivalent of the "buyer," even if the buyer-seller
exception were extended to the present facts. Thus, the
district court properly declined to give Banki's requested
"mere customer or beneficiary" instruction on the Conspiracy
Count.

In sum, the district court properly denied Banki's
request for an instruction that, if the jury found that
Banki acted as a "mere customer or beneficiary" of a hawala
transaction or unlicensed transmittal service, it could not
hold Banki liable either as an aider and abettor under
Counts Two and Three or as a conspirator under Count One.

## II. *Constructive Amendment or Variance*

Counts Four and Five of the Indictment charged
Banki with making materially false statements in response to
OFAC administrative subpoenas, in violation of 18 U.S.C. §
1001. "To convict a defendant of violating Section 1001,
the government must prove that the defendant: (i) knowingly

- 41 -

and willfully, (ii) made a statement, (iii) in relation to a matter within the jurisdiction of a department or agency of the United States, (iv) with knowledge that it was false or fictitious and fraudulent." *United States v. Wiener*, 96 F.3d 35, 37 (2d Cir. 1996).

Banki argues that the government constructively amended the false statement counts by shifting its theory of materiality during its case and closing arguments.  The government stated in its opening that Banki falsely identified his non-citizen cousin, instead of his U.S.-citizen father, as the source of wire transfers into his account because "OFAC can only regulate the conduct of U.S. citizens and residents."  In other words, the government presaged in its opening that its case would rest upon a citizenship theory of materiality.  During the defense opening, counsel stated that Bakhtiari "never got money from the father"; instead, counsel asserted that the money came from Banki's "uncle."

At trial, the government introduced substantial evidence that Banki's father was the source of the funds transferred into Banki's account, including e-mails from the father to Banki checking on the status of transfers and e-mails from Banki to his father confirming receipt of transfers.

Although the government had laid out a
citizenship-based theory of materiality in its opening
statement, in advance of the fourth day of trial the
government informed the defense that it intended to elicit
testimony regarding an alternate theory of materiality.
Specifically, the government sought to show, through the
testimony of OFAC enforcement investigations officer
Stephanie Rice, that Banki's uncle -- who was the actual
source of the transfers, according to the defense opening --
had been the subject of an OFAC investigation in the late
1990s.  The government thus was suggesting that Banki had
falsely identified the cousin as the source of the funds
rather than the uncle because the uncle had been under
investigation.  Defense counsel objected, arguing that "the
government [was] changing its theory of the case."  The
district court overruled the objection.

**A.    *Constructive Amendment***

The Fifth Amendment provides that "[n]o person
shall be held to answer for a capital, or otherwise infamous
crime, unless on a presentment or indictment of a Grand
Jury."  U.S. Const. amend. V.  Once a grand jury indicts a
defendant, the "charges may not be broadened through
amendment except by the grand jury itself."  *Stirone v.
United States*, 361 U.S. 212, 216 (1960).

– 43 –

We review a constructive amendment challenge de novo, *United States v. Wallace*, 59 F.3d 333, 336 (2d Cir. 1995), and a constructive amendment is a per se violation of the Grand Jury Clause, *United States v. Thomas*, 274 F.3d 655, 670 (2d Cir. 2001).

An indictment is constructively amended if either the "proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005). This occurs "when the trial evidence or the jury charge operates to broaden the possible bases for conviction from that which appeared in the indictment." *United States v. Rigas*, 490 F.3d 208, 225 (2d Cir. 2007) (brackets and internal quotation marks omitted). But "'[w]here a generally framed indictment encompasses the specific legal theory or evidence used at trial,' there is no constructive amendment." *Id.* at 228 (quoting *Milstein*, 401 F.3d at 65).

We have acknowledged that in applying these general principles, our cases have reached "'divergent results.'" *Rigas*, 490 F.3d at 228 (quoting *Milstein*, 401 F.3d at 65). Nonetheless, one "constant" in our case law is "that we have 'consistently permitted significant

- 44 -

flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial.'" *Id.* (quoting *United States v. Patino*, 962 F.2d 263, 266 (2d Cir. 1992)).

We conclude that the "core of criminality" alleged in Counts Four and Five of the Indictment was that Banki falsely identified his cousin -- a non-citizen relative as opposed to his citizen father -- as the source of wire transfers into his account in his January and July 2008 responses to OFAC subpoenas. *Cf. United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003) (describing the "core criminality" pleaded in the indictment as "a fraud scheme, operating between October 1995 and June 1996, whose ultimate purpose was the conspirators' realization of millions of dollars in illegal profits from their sales of inflated stripped warrants"); *United States v. Danielson*, 199 F.3d 666, 669-70 (2d Cir. 1999) (holding that indictment, which alleged that defendant possessed "7 rounds of .45 calibre ammunition" was not constructively amended when jury charge permitted jury to convict on basis of possession of shells, rather than full rounds). Even assuming there was a charge in theory at trial to the extent that the government suggested an additional motive for the false statement -- avoiding identifying the uncle who had been under investigation, the proof at trial and brief

- 45 -

reference in the government's rebuttal summation related to the same statements in the same letters as described in the Indictment.  Thus, there is no "uncertain[ty]" regarding "whether [Banki] was convicted of *conduct* that was the subject of the grand jury's indictment."  *Milstein*, 401 F.3d at 65 (emphasis added).

Accordingly, because the Indictment gave Banki notice of the core of criminality to be proved at trial, the Indictment was not constructively amended.

**B.  *Variance***

A variance occurs "when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment."  *Thomas*, 274 F.3d at 670 (internal quotation marks omitted).  Unlike a constructive amendment claim, "a defendant must demonstrate prejudice to prevail on a variance claim."  *Id.*

Here, Banki cannot demonstrate that he was prejudiced by the introduction of evidence regarding the prior investigation of his uncle.  In its proposed jury instructions, the government requested an instruction that "a false statement is material if it is capable of distracting Government investigators' attention away from a potential subject of an investigation."  Thus, Banki was on notice before trial of this potential theory of materiality.

– 46 –

Accordingly, the introduction of testimony that Banki's uncle's name "came up" in a prior OFAC investigation and the related statements in the government's rebuttal summation do not constitute an impermissible variance.

## III. *Government Misconduct in Rebuttal Summation*

Banki alleges two instances of government misconduct. First, Banki seeks a new trial on Counts Four and Five, arguing that the government committed misconduct by using its rebuttal summation to argue for the first time that Banki's lies to OFAC were material because his uncle had previously been the potential subject of an OFAC investigation. Second, Banki seeks a new trial on Counts One, Two, and Three, arguing that the government committed misconduct by arguing in rebuttal summation that Banki could be convicted solely on the basis of the $6,000 transaction. The district court rejected both claims of misconduct in denying Banki's Rule 33 motion. *See Banki*, 733 F. Supp. 2d at 411–14.

We review for abuse of discretion a district court's denial of a Rule 33 motion alleging prosecutorial misconduct. *See United States v. Burns*, 104 F.3d 529, 536–37 (2d Cir. 1997). A defendant asserting that a prosecutor's remarks warrant a new trial "face[s] a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his] right to a

fair trial." *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993). When evaluating a claim of improper argument, this Court "must consider the objectionable remarks within the context of the entire trial." *United States v. Espinal*, 981 F.2d 664, 666 (2d Cir. 1992). Even if a remark is deemed improper, it must cause "substantial prejudice" to result in a new trial. *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (internal quotation marks and citation omitted). In determining whether a defendant has suffered "substantial prejudice," this Court considers "[1] the seriousness of the misconduct, [2] the measures adopted by the trial court to cure the misconduct, and [3] the certainty of conviction absent the improper statements." *United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990).

We have reviewed the government's rebuttal summation in light of these principles, and conclude that there was no misconduct here. The district court did not abuse its discretion in denying the Rule 33 motion to the extent it was based on alleged prosecutorial misconduct.

## IV. *The Sentencing Enhancement*

In light of our decision above, we need not reach Banki's argument that the district court miscalculated the applicable Guidelines Range.

### *CONCLUSION*

For the foregoing reasons,

1.   As to Count One, we VACATE and REMAND;

2.   As to Count Two, we VACATE and REMAND;

3.   As to Count Three, we VACATE and REMAND; and

4.   As to Counts Four and Five, we AFFIRM.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

– 49 –